IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

JOHNNY DARNELL WATERS,        *
                              *
        Plaintiff,            *
                              *
        v.                    *
                              *
GEORGIA DEPARTMENT OF JUVENILE *        6:14-cv-10
JUSTICE, et al.,              *
                              *
        Defendants.           *
                              *
                              *
                              *

---
**O R D E R**
---

   This case concerns a dispute between a state employee and
his supervisors and coworkers over what personal activity should
occur at work.   Plaintiff Johnny Darnell Waters, a probation
specialist with the Georgia Department of Juvenile Justice's
("DJJ") Evans County Services Office, complained to management
that his coworkers were misusing their time and violating
department policies.   To his surprise, his supervisors did not
immediately investigate his accusations; they investigated
Plaintiff instead and discovered that he frequently viewed
prohibited content on his work computer.   After preliminary
reports were verified by the DJJ's Office of Investigations, the
DJJ terminated Plaintiff and announced his termination in a
press release.   This case soon followed.

Presently before the Court is Defendants' motion for summary judgment. (Doc. 55.) Defendants seek summary judgment on Plaintiff's claim against Defendant DJJ under the Georgia Whistleblower Act ("GWA"), O.C.G.A. § 45-1-4, and on Plaintiff's claims under 42 U.S.C. § 1983 against the DJJ and Defendants Jeffery Alligood and Timothy Strickland. The Court **GRANTS** Defendants' motion.

## I. BACKGROUND

Plaintiff Johnny Darnell Waters began his employment as a Juvenile Parole Probation Specialist I with the DJJ's Evans County Services Office on March 1, 2007. At the office, Timothy Strickland, the office's Juvenile Program Manager, supervised Plaintiff. Strickland, in turn, reported to DJJ Assistant District Director Rusty Rogers, who reported to Southeast Regional Administrator Defendant Jeffrey Alligood.

Plaintiff's position required the supervision of children between the ages of seven and eighteen to ensure they comply with probation conditions. DJJ policy required Plaintiff to log every contact made with children under his supervision into an internal tracking system within 72 hours. During 2009, Plaintiff failed to meet policy standards in documenting required child contacts. Strickland first discussed this with Plaintiff in June 2009 and gave him two formal reminders in July and September. Strickland placed Plaintiff on decision-making

leave for the repeat documentation violations from January 2010 through January 2011. His performance evaluation for July 1, 2009 through June 30, 2010 indicated that Plaintiff did not meet performance expectations. Plaintiff's July 2011 performance evaluation indicated that Plaintiff met expectations, but that he needed improvement regarding logging child contacts within the 72-hour documentation period.

In 2011, Plaintiff made complaints concerning conduct by other DJJ employees. In particular, Plaintiff alleged the following: (1) that his coworker Michael Clark sold another coworker, Malcolm Tucker, a double-barrel shotgun in front of the Evans CSO office; (2) Clark transported shotgun shells in his state vehicle; and (3) Strickland permitted Clark to view interview questions for a position he applied for and view other applicants' resumes. At the time Plaintiff made these complaints, Strickland did not pursue any investigation into the alleged incidents.

On December 6, 2011, Strickland met with Plaintiff and explained his concern over the inadequate descriptions he included in his case notes. According to Strickland, on Wednesday, December 14, 2011, Strickland conducted a regularly scheduled audit of the office's cases. Strickland claims to have found that Plaintiff failed to record any contacts in the prior three days. This concerned Strickland because he had noticed Plaintiff had not left the office on Monday or Tuesday

of that week. Because Plaintiff does not work Wednesdays, this left Plaintiff with only Thursday and Friday to have any child contacts. For his part, Plaintiff maintains that he remained well-within the allotted 72 hours to document child contacts.

Ostensibly for the purpose of determining what Plaintiff had done with his time that week, Strickland approached Plaintiff's computer and began to search his web browsing history.[1] According to Strickland, he discovered Plaintiff visited numerous inappropriate and non-work-related websites, including, among others, clickandflirt.com and baconlube.com. Strickland created a list of the websites and included print-outs from certain ones and, at Rogers's direction, completed a "Special Incident Report" ("SIR"). Rogers then informed Alligood of the material found on Plaintiff's computer. Alligood directed Rogers to call DJJ Principal Investigator Sheila Phillips. Phillips drove to the Evans County Services Office, confiscated Plaintiff's computer, and sent it to the Georgia Bureau of Investigation's ("GBI") crime lab for a forensic audit. DJJ Deputy Commissioner Carl Brown instructed Alligood to suspend Plaintiff with pay pending the investigation. Alligood then relayed the suspension directive to Rogers and Strickland. Plaintiff, who typically does not work

---

[1] The parties dispute whether Plaintiff's computer was unlocked when Strickland approached it or whether Strickland necessarily asked Michael Clark for his password. This dispute is immaterial for this motion.

on Wednesdays, came to the office that day, at which point Strickland informed him that he was suspended pending investigation.

Investigator Phillips assigned DJJ Senior Investigator Michael Maybin to investigate Plaintiff's computer use. Maybin obtained Strickland's SIR and interviewed Strickland concerning his investigation. On December 19, Maybin interviewed Plaintiff and gave him the opportunity to prepare a written statement. In his statement, Plaintiff claimed that he did not subscribe to clickandflirt.com and had only visited the website in an attempt to unsubscribe. During the course of the interview, Plaintiff acknowledged visiting non-work-related websites, including Facebook, Bass Pro Shop, and Georgia Wildlife, and a website where he viewed a video of how to make a "drain oh bomb."

Concurrently with Maybin's investigation, GBI Agent Matthew Heath conducted a forensic examination of Plaintiff's computer. Heath prepared a summary report and an excel file detailing Plaintiff's internet use. Heath determined that

> [Plaintiff] extensively visited numerous non-work related and personal websites, to include www.clickandflirt.com, a dating website; www.baconlube.com, a website advertising a sexual lubricant; www.facebook.com, a social networking website; and www.theoutdoorstrader.com, a forum to swap and sell firearms and other outdoor items. [Heath] also determined through [his] audit that [Plaintiff] had viewed pictures sexually posed women. Further, [Plaintiff's] computer use produced

a combined total of ten thousand (10,000)
hits on www.theoutdoorstrader.com, about
eleven (11) hits on www.baconlube.com, and
approximately four hundred and forty-eight
(448) hits on www.clickandflirt.com.

(Heath Aff., Doc. 44, Ex. 4 ¶ 6.)   Heath gave his report to
Maybin and also discussed its finding by phone.

On January 25, 2012, Maybin prepared a final report of
investigation that includes Maybin's report of investigation,
Strickland's SIR, an Administrative Investigative Notice, a
memorandum of Maybin's interview with Plaintiff, a letter from
Strickland, and the GBI's forensic report (collectively the "DJJ
report").   Maybin gave the report to Phillips who prepared a
memorandum summarizing the findings and concluding that
Plaintiff violated DJJ policies.   Phillips sent the report and
memorandum to Brown and Sarah Draper, the Director of the DJJ
Office of Internal Investigations.   Two days later, Draper
informed Commissioner Gale Buckner of the investigation and sent
the DJJ report to DJJ Staff Attorney André Castaing.   Brown and
Draper later met with Commissioner Buckner regarding the
investigation and explained the GBI's forensic audit.
Commissioner Buckner testified that she "trusted the unbiased
information" the GBI found on the computer.

On February 7, 2012, Buckner emailed Draper regarding the
status of the case. Draper replied to Brown and advised him that
the Office of Legal Services was reviewing the case.   At the
same time, Castaing prepared a termination review and gave it to

DJJ General Counsel Tracy Masters. Castaing did not give Commissioner Buckner a copy of the review and, to his knowledge, no one else did either. That afternoon, Commissioner Buckner informed Castaing of her decision to terminate Plaintiff immediately. When she made the decision to terminate Plaintiff, Buckner had not read the reports generated by the DJJ or GBI; her decision was based on what Draper and Brown told her, principally that the investigation indicated that Plaintiff misused his state computer to view sexually explicit websites. Additionally, she had no knowledge of Plaintiff's complaints regarding his coworkers' policy violations.

After meeting with Commissioner Buckner, Castaing called Alligood to notify him that Buckner wanted Plaintiff terminated that day. He then emailed Alligood and Strickland a draft termination letter for Alligood's signature. Later that day, Strickland met with Plaintiff, informed him of his termination, and gave him the termination letter, which was signed by Alligood.

Two days later, Sam Clonts, the Acting Director of the DJJ Office of Human Resources, informed Plaintiff by letter that a "no rehire" designation was placed on his employment record. Then, on February 15, 2012, the DJJ issued a press release, which was transmitted to local media outlets, announcing Plaintiff's termination following the investigation into inappropriate use of state property and violations of DJJ

policies. DJJ Public Affairs Officer Jim Schuler testified that Commissioner Buckner decided to issue a press release concerning the termination. In drafting the press release, Schuler relied on information from the Commissioner's office, the termination letter, and a synopsis of Strickland's investigation. Plaintiff later learned about articles in the newspaper regarding his termination.

Concurrent to the DJJ's investigation into Plaintiff's computer use, Strickland and Alligood also began to investigate Plaintiff's allegations of rule violations by his coworkers. On January 13, 2012, the DJJ Office of Investigations received a Special Incident Report from Strickland containing Plaintiff's allegations concerning Michael Clark's gun purchase. Maybin investigated these allegations, but was unable to substantiate them. Each of the accused denied the misconduct, and Maybin found no other evidence to corroborate Plaintiff's allegations.

Plaintiff believes that Strickland and Clark retaliated against him for reporting policy violations to Alligood. Plaintiff initially filed suit in the Superior Court of DeKalb County, Georgia. That suit was voluntarily dismissed, and the present litigation alleging retaliation in violation of the GWA and denial of procedural due process was filed on February 2, 2014.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways: by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex,

477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory

allegations contained in the complaint.  See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiffs notice of Defendant's motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. 45.)  The notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), therefore, are satisfied and the motion is ripe for review.

### III.  DISCUSSION

Plaintiff's original complaint named the DJJ as a defendant for two counts.  Count One alleged that the DJJ deprived Plaintiff of his constitutionally protected reputational liberty interest under 42 U.S.C. § 1983.  (Compl., Doc. 1 ¶¶ 35-42.) Count Two alleged that Defendant DJJ terminated Plaintiff in violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4. (Id. ¶¶ 43-46.)  Plaintiff later amended his complaint to add Defendants Strickland and Alligood to the § 1983 claim.

#### A. Reputational Liberty Claim

Count One of Plaintiff's Amended Complaint is a procedural-due-process claim for deprivation of Plaintiff's constitutionally protected reputational liberty interest under

11

42 U.S.C. § 1983 against Defendants Alligood, Strickland, and the DJJ directly. Below, the Court addresses the existence of adequate state law remedies. Because the Court finds that mandamus is an adequate state law remedy, the Court **GRANTS** summary judgment in Defendants' favor on Plaintiff's § 1983 claim against all Defendants. The Court also **GRANTS** summary judgment on the alternate ground of sovereign immunity with respect to Plaintiff's § 1983 claim against the DJJ.

### 1. Exhaustion of Adequate State Law Remedies

To prove a reputational liberty claim, a plaintiff must prove: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing." Cotton v. Jackson, 216 F.3d 1328, 1330 (11th Cir. 2000). For present purposes, the Court assumes that Plaintiff can satisfy elements one through five. Narrowing the focus to the sixth element, "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." Id. at 1331.

Defendants argue that Plaintiff failed to pursue state law remedies to clear his name before filing suit. In particular, Defendants argue that Plaintiff did not request a name-clearing

hearing from the DJJ and did not file a mandamus action in state court following his termination. Relying on Cotton, Defendants contend that Plaintiff possesses an adequate state-law remedy, requiring summary judgment in their favor.

In Cotton, South Georgia College fired the plaintiff after receiving EEOC complaints charging plaintiff with sexually harassing two coworkers. Id. at 1329. The plaintiff repeatedly requested a hearing to contest the charge, which the College and, subsequently, the Board of Regents denied. The plaintiff then filed suit in federal court. On appeal, the Eleventh Circuit held that "because adequate state law remedies were available to provide Plaintiff with the opportunity for a name clearing hearing, he has failed to state a procedural due process claim." Id. at 1330. In particular, the Court found that the plaintiff could have sought a writ of mandamus in a Georgia Superior Court. Id. at 1332-33. The Supreme Court of Georgia later confirmed that mandamus is an available remedy under O.C.G.A. § 9-6-20 for the purpose of seeking a name-clearing hearing. Joiner v. Glenn, 702 S.E.2d 194, 196 (Ga. 2010). Ordinarily, failure to seek a writ of mandamus "deprives a claimant of an actionable cause of action." Harris v. Pierce Cty., Ga., No. 5:13-cv-82, 2014 WL 3974668, at *3 (S.D. Ga. Aug. 14, 2014).

Plaintiff asserts that this is not an ordinary case for two reasons. First, once the press release issued, mandamus would

be inadequate, and, second, because Plaintiff lacked notice of his ability to request a name-clearing hearing from the DJJ directly. The Court disagrees: both reasons are typical of reputational liberty claims.

The Court begins with Plaintiff's argument that the press release defeats the adequacy of mandamus relief. It is well-established that post-publication name-clearing hearings may satisfy due process and that a writ of mandamus ordering one is an adequate state-law remedy. "[T]o be adequate, the state procedure need not provide all relief available under Section 1983. Instead, the state procedure must be able to correct whatever deficiencies exist and to provide with what process is due." Cotton, 216 F.3d at 1331 (citations omitted). Harrison v. Wille, 132 F.3d 679 (11th Cir. 1998) noted that "the only process due Plaintiff to protect his liberty interest was a 'name clearing hearing,'" and that such a hearing "need not take place before termination or the publication of the damaging information." Id. at 683 n.9 (first citation omitted) (citing Campbell v. Pierce Cty., Ga., 741 F.2d 1342, 1345 (11th Cir. 1984)). Cotton itself states that the name-clearing hearing "can be held either before or after the termination *or publication*." Cotton, 216 F.3d at 1330 (emphasis added) (citing Harrison, 132 F.3d at 683 n.9). Here, Plaintiff was due a name-clearing hearing, not the non-issuance of the press release

Read together, _Cotton_ and _Harrison_ stand for the proposition that a post-publication mandamus action to receive a name-clearing hearing is an adequate state-law remedy. Plaintiff has not supported his position with any case holding or even assuming that mandamus is inadequate in the post-publication context. _Cotton_ controls this case and the Court finds that mandamus is an adequate remedy.

Having found that mandamus is an adequate state-law remedy, the Court does not address Plaintiff's argument that he should be excused from asserting an otherwise adequate state-law remedy because the DJJ did not notify him of his right to a name-clearing hearing. _See id._ at 1332 n.3.

Because "mandamus would be an adequate remedy to ensure that Plaintiff was not deprived of his due process rights . . ., Plaintiff has failed to state a claim for a procedural due process violation . . . ." _Cotton_, 216 F.3d at 1333 (citations omitted). The Court **GRANTS** summary judgment in Defendants' favor on Plaintiff's § 1983 claims.

### 2. Sovereign Immunity

Plaintiff's § 1983 claim against the DJJ fails for an additional reason: Plaintiff pled the claim against a sovereign state and not a "person" under § 1983.

Defendants did not mention this claim in their opening brief because they believed Plaintiff abandoned the claim in his

brief opposing Defendants' motion to dismiss. (Def.'s Reply Br., Doc. 52 at 17.) There, Plaintiff acknowledged that "Defendant Georgia DJJ cannot be liable under his § 1983 claim." (Pl.'s Opp. Br., Doc. 13 at 4.) Nevertheless, Plaintiff's response brief claims that "Defendants' Motion does not include Defendant DJJ in its analysis of the 42 U.S.C. § 1983 claim, apparently because Defendants believe DJJ is entitled to Eleventh Amendment Immunity." (Doc. 50 at 13 n.4.) In reply, Defendants argue that the DJJ is immune even from claims for equitable relief.

Plaintiff's claim for equitable relief is brought against the DJJ, a state department possessing sovereign immunity and not one of its officials in an official capacity. "Because [Plaintiff] has sued an agency of the state rather than state officials, the Eleventh Amendment also bars injunctive or prospective relief." Fouche v. Jekyll Island State-Park Authority, 713 F.2d 1518, 1523 (11th Cir. 1983) (citing Alabama v. Pugh, 438 U.S. 781, 782 (1978) (per curiam)). Summary judgment is therefore **GRANTED** in Defendant DJJ's favor on this claim.

### B. Georgia Whistleblower Act Claim

Count two of Plaintiff's original Complaint alleged that the DJJ terminated Plaintiff in violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4. Georgia courts have

applied the <u>McDonnell Douglas</u> framework to retaliation claims

under the GWA. <u>Touhy v. City of Atlanta</u>, 771 S.E.2d 501, 504

(Ga. Ct. App. 2015).

> Under the <u>McDonnell Douglas</u> framework, the
> plaintiff must first make a prima facie
> case. If the plaintiff makes a prima facie
> case, the burden of production shifts to the
> employer to articulate some legitimate,
> nondiscriminatory reason for the employment
> decision. If the employer successfully
> meets the burden of production, then the
> burden shifts back to the plaintiff to show
> that each proffered reason was pretext.

<u>Id.</u> at 505. Defendants argue that Plaintiff cannot demonstrate

a prima facie case and cannot demonstrate that their

nondiscriminatory reason to terminate Plaintiff was pretextual.

**1. Prima Facie Case**

To prove a prima facie retaliation claim, a plaintiff must

show that "(1) he was employed by a public employer; (2) he made

a protected disclosure or objection; (3) he suffered an adverse

employment action; and (4) there is some causal relationship

between the protected activity and the adverse employment

action." <u>Albers v. Ga. Bd. of Regents of Univ. Sys. of Ga.</u>, 766

S.E.2d 520, 523 (Ga. Ct. App. 2014).

Defendants only challenge the fourth element of the prima

facie case: the existence of a causal relationship. In a

typical whistleblower retaliation claim, to establish a causal

relationship a plaintiff must show that the decision maker knew

that the plaintiff engaged in protected whistleblowing activity.

17

<u>Forrester v. Ga. Dept. of Human Servs.</u>, 708 S.E.2d 660, 670 (Ga. Ct. App. 2011). Here, however, Plaintiff does not argue that Commissioner Buckner knew of Plaintiff's complaints when she fired him. Instead, Plaintiff argues that Commissioner Buckner was the "cat's paw" of Defendants Strickland and Alligood, whose biased investigation is the true cause of Plaintiff's termination. Defendants insist that the GWA does not allow cat's-paw causation because the GWA requires "but-for" causation and does not follow Title VII's motivating-factor causation. <u>See Sims v. MVM, Inc.</u>, 704 F.3d 1327 (11th Cir. 2013)(distinguishing whether cat's paw may be used to show causation under ADEA from Title VII on the grounds that the former requires "but-for" causation and the latter only "motivating factor").

Whether the cat's-paw theory of causation is available under the GWA is a question of law that appears to be a matter of first impression.[2] For present purposes, the Court assumes—

---

[2] <u>Powell v. Valdosta City Sch. Dist.</u>, No. 7:13-cv-53, 2014 WL 5791563 (M.D. Ga. Nov. 6, 2014) is the only case applying the cat's-paw theory under the GWA. In <u>Powell</u>, the court assumed that cat's-paw causation was available under the GWA because it is available under Title VII, which Georgia courts have looked to regarding the causal link element. <u>Id.</u> (citing <u>Freeman v. Smith</u>, 750 S.E.2d 739, 741-43 (Ga. App. 2013).
  In <u>Sims v. MVM, Inc.</u>, 704 F.3d 1327 (11th Cir. 2013), the Eleventh Circuit articulated one possible explanation for not applying a cat's-paw theory under the GWA. <u>Sims</u> concerned a retaliation claim under the American Disabilities Act. The court distinguished claims under the ADEA from the USERRA retaliation claims at issue in <u>Staub v. Proctor Hosp.</u>, 562 U.S. 411, 421 (2011). The ADEA, the court explained, requires "but-for" causation, while USERRA and Title VII

18

but does not find—that cat's-paw causation is permitted under the GWA and analyzes Plaintiff's claim. Because the Court finds that Plaintiff cannot make a prima facie case even under a cat's-paw theory, the Court does not decide whether cat's-paw causation is available under the GWA.

In the context of retaliation claims under the FMLA and Title VII, the Eleventh Circuit has held that "causation may be established when a decisionmaker followed a biased recommendation from a non-decisionmaker without independently investigating the complaint." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1992). In those cases, the decisionmaker acts as the biased non-decisionmaker's "cat's paw." "But where the 'decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee.'" Caldwell v. Clayton

_____

both require retaliation to be only a motiving factor. Sims, 704 F.3d at 1335. The court found that cat's-paw causation was not allowed in "but-for" statutes and held that it was not available under ADEA. Id. at 1336.

Defendant argues that the GWA similarly requires but-for causation. See O.C.G.A. 45-1-4(d)(2) ("No public employer shall retaliate against a public employee *for* disclosing a violation" (emphasis added)). The Supreme Court of Georgia and Court of Appeals of Georgia appear to have never directly addressed whether but-for or motivating factor causation is required under the GWA, much less whether cat's-paw causation is allowed.

In this case, the only way Plaintiff can establish a causal relationship is through a cat's-paw theory. The Court assumes that theory is allowed, but finds that it is not satisfied on these facts.

Cty. Sch. Dist., 604 F. App'x 855, 861 (11th Cir. 2015) (per curiam) (quoting Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001)). "A plaintiff operating under a cat's paw theory must 'prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee.'" Foster v. Thomas Cty., 927 F. Supp. 2d 1350, 1360-61 (M.D. Ga. 2013) (quoting Stimpson, 186 F.3d at 1331).

In Staub v. Proctor Hosp., 562 U.S. 411, 421 (2011), the Supreme Court explained the relationship between independent investigations and facts provided by biased supervisors:

> [I]f the independent investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor.

Id. at 421. In this way, an independent investigation that does not delegate fact finding cuts off the causal relationship between the non-decisionmaker's biased investigation and the termination.

The Court assumes that Strickland and Alligood, who each knew of Plaintiff's complaints regarding rule violations, conducted a biased initial investigation. The question becomes whether Maybin and Heath's investigations, the contents of which

were reported to Commissioner Buckner by Brown and Draper, were similarly tainted by their reliance on facts relayed to them by Strickland and Alligood or whether their factfinding was sufficiently independent.

Maybin's DJJ report included the following: (1) a report of investigation created by Maybin; (2) the SIR created by Strickland; (3) an administrative investigative notice directed to Plaintiff; (4) a memorandum of the interview between Maybin and Plaintiff; (5) a letter from Strickland; and (6) the GBI's forensic computer report. The SIR and Strickland's email relay facts which are the result of Strickland's assumedly biased investigation. But Maybin's report includes two documents that are assuredly the result of independent factfinding: the memorandum of Maybin's interview with Plaintiff, and the GBI's forensic report.

In the interview, Plaintiff acknowledged the truth of most of the facts relayed to Maybin in Strickland's SIR. For instance, Plaintiff admitted visiting websites devoted to hunting and firearms, including outdoortrader.com. Plaintiff did, however, contest that he ever visited baconlube.com and insisted that his only visit to clickandflirt.com was to unsubscribe from the website's unsolicited emails. Plaintiff's admissions in the interview amount to independent verification of the facts contained in Strickland's SIR.

The GBI's report is also independent.  In mid-January 2012, Heath conducted the forensic audit of Plaintiff's state computer and summarized his findings in a report and associated spreadsheet.  (Heath Aff., Doc. 44, Ex. 4 ¶ 5.)  Prior to beginning the audit, Heath "was informed that the computer was suspected to have been used to access dating websites online social sites, and informative documents detailing the usage of nuclear bombs."  (Heath Aff., Ex. A at 1.)  Heath, therefore, had knowledge of the assumedly biased fact from Strickland's investigation.  Heath then conducted his investigation using the GBI's standard procedure to collect evidence, which include the use of software tools such as "Encase v6, IEF v4, and NetAnalysis."  (Id.)

The Encase and NetAnlysis reports found internet activity consistent with that described in Strickland's SIR.  Heath's report notes that theoutdoorstrader.com, "a social forum website targeted towards hunters and gun owners," and big983.com, an internet radio service, were among the most frequently visited non-work-related websites.  (Id.)  Although the excel spreadsheet containing the entire results does not appear to be in the record, Heath states that he found over 10,000 hits on theoutdoorstrader.com, 11 hits on baconlube.com, and approximately 448 hits on clickandflirt.com, among other personal internet activity.  (Heath Aff. ¶ 6.)

Additionally, Heath used the Encase software to determine the visual images viewed during Plaintiff's internet browsing. To do this, Encase searches a computer's temporary internet files, which includes images that were viewed during internet browsing but not intentionally saved by a computer's user. The Encase report indicated that Plaintiff's files included images of sexually posed women, Facebook profiles, and advertisements for dating, hunting, and firearm websites. Heath also discovered pictures of deer and firearms that were intentionally saved to Plaintiff's "My Pictures" folder. The report indicated that no pornographic images or images depicting explosives or bombs were discovered. (Heath Aff., Ex. A at 1.)

In her memorandum to Brown and Draper attached to Maybin's investigation, Sheilla Phillips explained that "Heath forensically examined [Plaintiff's] state desktop computer" and found that he "visited numerous non-work related and personal websites" and "viewed pictures of sexually posed women in under garments and bikinis extensively on Facebook and ClickandFlirt.com." (Doc. 44, Ex. 27 at 18.) Further, Phillips explained that Plaintiff admitted to viewing the websites in question, with the exception of baconlube.com and with the caveat that his only visit to clickandflirt.com was to unsubscribe. Phillips's introductory memorandum, therefore, summarizes the two key pieces of independent investigatory work performed by Maybin and Heath: the interview with Plaintiff and

the forensic audit of his state computer. Finally, in her affidavit and deposition testimony, Commissioner Buckner makes clear that it was the facts discovered in the independent investigation conducted by Heath, as relayed to her by Brown and Draper, which led her to terminate Plaintiff.[3]

Because independent factfinding led to the same determination that Plaintiff visited the websites in question, and because Commissioner Buckner relied on the independent investigation, the Court finds that the required causal relationship necessary for a prima facie case cannot be established. The Court, therefore, **GRANTS** summary judgment in favor of Defendant DJJ on Plaintiff's GWA retaliation claim.

## IV. CONCLUSION

As discussed, the Court **GRANTS** Defendants' motion for summary judgment on all counts. The Clerk **SHALL** enter judgment

---

[3] The Court notes that Plaintiff disputes whether he visited clickandflirt.com more than on a single occasion to unsubscribe. Plaintiff does not, however, dispute that Commissioner Buckner relied on Draper and Brown's description of Heath's investigation that found Plaintiff did visit the website more often. Commissioner Buckner, therefore, relied on Heath's independent factfinding into what websites were visited on the state computer in question. It is possible Heath's investigation was inaccurate, as Plaintiff maintains, and that Commissioner Buckner's decision was a mistake. But retaliation laws do not check to see whether the decisionmaker made a substantively correct decision; the GWA, like most retaliation and discrimination laws, ensures that a decisionmaker does not take an adverse action based on improper reasons. See Brown v. Am. Honda Motor Co., 939 F.2d 946, 951 (11th Cir. 1991) (a defendant may act "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it [] is not for a discriminatory reason.").

24

in favor of Defendants and against Plaintiff and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _____ day of April, 2016.

 

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA